WORRALL (UNITED STATES v.). See Case No. 16,766.

---

## Case No. 18,050.

### WORTENDYKE v. WHITE.

[2 Ban. & A. 25.] [1]

Circuit Court, D. New Jersey. March, 1875.

OWNER OF PATENTED MACHINE—RIGHT TO USE MACHINE—INJUNCTION AGAINST INFRINGEMENT—LACHES.

1. Complainant sold to McP. a patented machine for cutting paper for paper twine, for $225, and gave him a personal license to use it upon payment of a royalty of five cents per pound. Monthly statements were to be made, and on failure to pay the license fee for thirty days after it became due, the complainant could revoke the license. McP. died, and parts of the machine were subsequently sold at auction as scrap iron to N., who reconstructed it out of the old parts and sold it to the defendant. *Held*, that such a purchase by N. gave him no right to reconstruct and use, from these loose parts, a working machine embodying the complainant's invention.

2. The difference between the ownership of a patented machine and the right to use it, considered.

3. Where the complainant's suspicions of the infringement are allayed by the direct misrepresentations of the defendant, the court cannot give to such defendant any advantage resulting from the lapse of time before applying for injunction.

4. Where a motion for a preliminary injunction is resisted on the ground of complainant's laches, the burden of proving complainant's previous knowledge of the infringement is upon the defendant, and must be proved by him.

[This was a bill in equity by John B. Wortendyke against James White, for the infringement of letters patent No. 44,249, granted to complainant September 13, 1864; reissued November 22, 1864,—No. 1,825.]

E. Q. Keasbey, for complainant.

A. J. Todd, for defendant.

NIXON, District Judge. The bill of complaint was filed in this case February 4, 1875, alleging an infringement of reissued letters patent. No. 1,825, for "machine for cutting

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

paper for paper twine," and granted to the complainant November 22, 1864. The matter is now before the court on an application by the complainant for a provisional injunction. The infringement is substantially admitted by the defendant, and two questions are presented by the affidavits in the case for consideration: (1) Whether the defendant has exhibited such a satisfactory title to the machine in use by him, that he should be allowed to continue its use, as against the exclusive rights of the complainant under the patent, until the final hearing. (2) Whether there has been an acquiescence by the complainant in the infringement of the defendant to the extent that he should not now be protected by a preliminary injunction.

1. The affidavits presented by the complainant on the hearing, disclose, that a few weeks after he obtained his reissued letters patent, to wit, in the month of December, 1864, he caused to be built three machines embodying his invention, one of which he sold to Elijah Rosencrantz, and the remaining two to a Dr. McPherson, of Paterson, New Jersey; that these were delivered to McPherson, at the price of $225 each, which was the cost of their construction; that a personal license was given to the said McPherson to use them in the manufacture of paper twine; that monthly accounts were to be rendered to the patentee of the quantity of paper twine manufactured and sold, on which he was to pay a royalty of five cents per pound, upon every pound sold during the month; that on every package of twine made, should be marked the words, "Wortendyke's Patent Manilla Twine." That on his failure to pay the said license fee, for thirty days after it became due, the complainant should be at liberty to revoke the license to manufacture and sell; that McPherson undertook the manufacture of twine with the machines, but after a few months' trial abandoned the business, as not remunerative; that he paid nothing to complainant as a royalty for their use, and upon his death in January, 1866, the complainant made a settlement with the representatives of his estate, took back one of the machines in part payment of his claim, and did not take back the other, because he was informed, that it had been broken up, and was worthless for further use.

This statement is not controverted by the defendant. He admits that he saw the machine while it was in the hands of McPherson, who told him that he had bought it of complainant. He claims, that in the month of June, 1871, he purchased it of one John Nichols for a valuable consideration, without notice of any restriction or condition annexed to the absolute ownership of the said McPherson, and that Nichols bought the machine of McPherson. But Nichols' affidavit hardly sustains the defendant's claim. He swears that he sold the machine to the defendant about the month of May, 1870, for about two hundred dollars; and that he had

never heard and had no reason to believe, that there was any condition or reservation of royalty attached to it while it was owned by McPherson, or at any other time. He does not say of whom, or under what circumstances, he purchased it. He probably meant to suggest by the cautious phraseology used, that he had something to do with McPherson in regard to it; and if so, it is feared he was suggesting what was not true. Other affidavits in the case tend to show, with reasonable certainty, that McPherson sold the machine, a short time before his death, to one John Dean, of Paterson, for $65 or $70; that in 1868, Hindel & Allen, auctioneers in the city of Paterson, made public sale of a lot of machinery and scrap iron, belonging to Dean, and that among the iron were parts of this dismantled machine; that they were bought, as scrap iron, by the firm of P. V. H. Van Reiper & Son, who, in the year 1869, made sale of the parts of the machine thus purchased, to John Nichols for $25.30. Mr. Geo. P. Van Reiper, one of the members of the firm, testifies that the entry of the sale in their books is as follows: "John Nichols, Dr. To 253 lbs. (part of paper-cutting machine), $25.30." It is hardly necessary to observe that such a purchase gave no right to Nichols to reconstruct from these loose materials a working machine, embodying the complainant's invention. Confusion on this subject, has, doubtless, arisen from not distinguishing between the ownership of a patented machine and the right to use it. The one does not always include the other. Thus, it was held by Mr. Justice McLean, in Wilson v. Stolley [Case No. 17,839], that where a person, licensed to run a patented machine, sold it to another, the license to run the machine did not necessarily pass to the grantee. And so, where a suit was brought against a sheriff for the infringement of the patent rights of the plaintiffs, and the proof was that he had levied upon and sold three completed patented machines, belonging to the plaintiffs, by virtue of an execution against them, Justice Story held that such sale was no violation of the patent act, which imposed a penalty upon any one for selling the thing whereof an exclusive right is secured to a patentee, without the patentee's consent, because it did not follow that the sale of the materials of which a machine was composed, carried with it the right to use the machine without a license. Sawin v. Guild [Id. 12,391]. The affidavits in the case tend to prove, that all McPherson got from the complainant was a personal license to use the machine, upon the payment of a certain royalty. If that were an equitable right which was assignable—which I am far from asserting—there is no proof that McPherson ever attempted to assign it.

2. But the defendant claims that the complainant has so long delayed his application as to be cut off from the right to a preliminary injunction. Courts of equity do not

look with favor upon those who slumber over their rights. Bovill v. Crate, reported in L. R. 1 Eq. 388, and quoted by defendant's counsel, is just in point. That was an application to restrain the defendant from the use of a patented article, by an interlocutory injunction. The bill was filed in July, 1865; and as soon as it appeared in the case that the complainant had written to the defendant in the preceding November, complaining that he had been infringing for upwards of a year, the vice chancellor stopped the proceedings by inquiring, how it was possible, after that correspondence, to ask for an interlocutory order? He subsequently remarked, in refusing the injunction, "It is very important to the practice of the court, not to have it cited as authority hereafter, that the court will grant such relief as is here asked, upon an application made in July, 1865, when it is informed that the plaintiff, certainly as early as in August, 1864, and probably in July, 1864, knew what he knows now of defendant's proceedings." But there must be satisfactory proof of knowledge, or means of knowledge, before laches can be imputed. The only evidence here, that complainant was aware of the defendant's infringement, is the affidavit of the defendant himself. He says, that about two years ago he had a conversation with complainant on the cars coming from New York, and then stated to him that he was using the McPherson machine and claimed the right to use it. On the other hand, the complainant swears that the first knowledge he ever had of the defendant's infringement was in the month of January last, when he was informed of the fact by one Terhune; that the only conversation on the subject he had with the defendant was on the cars, and was referred to in the defendant's affidavit; that he then informed the defendant that he had understood that he had constructed and was using a machine for cutting paper twine, which was an infringement of his patent; that the defendant replied that he was not, but that he was using the same machine that one Gilmore had used in making paper twine in Lee, Massachusetts; that affiant knew that Gilmore had gone out of business, some time previously, and inferred that he had bought and was using a Gilmore machine. If it be true that the suspicions of the complainant, in regard to the defendant's infringement, were allayed by the direct misrepresentations of the defendant, the court cannot give to him any advantage resulting from the lapse of time. But whether this be true or not, the allegation of the defendant in regard to knowledge is unequivocally denied by the complainant, and in such an issue the burden is on the defendant.

A preliminary injunction must issue against the defendant, until the further order of the court.